UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

VERONICA FOODS COMPANY,

           Plaintiff,

    v.

KURT ECKLIN, et al.,

           Defendants.

Case No.  16-cv-07223-JCS

**ORDER GRANTING MOTION TO DISMISS FIRST AMENDED COMPLAINT**

Re: Dkt. No. 29

## I.    INTRODUCTION

Plaintiff Veronica Foods Company ("Veronica Foods") brings this action against Defendants Kurt Ecklin and Millpress Imports LLC ("Millpress") alleging that Defendants misappropriated Veronica Foods' trade secrets in violation of both the federal Defend Trade Secrets Act ("DTSA," 18 U.S.C. § 1836), and the California Uniform Trade Secrets Act ("CUTSA," Cal. Civ. Code §§ 3426–3426.11, California's implementation of the Uniform Trade Secrets Act ("UTSA") adopted in many states), by improperly "using Ecklin's knowledge of [Veronica Foods'] trade secrets – knowledge that Ecklin acquired solely through the course of his employment by Veronica Foods."  1st Am. Compl. ("FAC," dkt. 28) ¶ 6.  Veronica Foods has amended its complaint once after Defendants moved to dismiss.  *See generally id.*  Defendants now move to dismiss once again, arguing that Veronica Foods fails to state a valid trade secrets claim under either the DTSA or the CUTSA, and that Veronica Foods improperly initiated this lawsuit as a means to exploit its monopoly power in the market.  *See generally* Mot. (dkts. 29, 30). The Court held a hearing on May 26, 2017.  For the reasons detailed below, the Court GRANTS Defendants' motion and DISMISSES Veronica Foods' first amended complaint with leave to further amend no later than July 31, 2017.[1]

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

United States District Court
Northern District of California

United States District Court
Northern District of California

## II.     BACKGROUND

### A.     Allegations and Claims of the First Amended Complaint

#### 1.  Factual Allegations

Veronica Foods has been in business since the 1920s and has operated in Oakland, California since the 1930s.  FAC ¶ 15.  "Currently, the heart of [Veronica Foods'] business is the bulk importation and sale of fresh, estate-produced, extra virgin olive oils and Specialty Products" such as balsamic vinegar.  *Id.* ¶ 16.  Veronica Foods claims that it has "pioneered" a "unique" business model "in which retail stores purchase bulk quantities of extra virgin olive and other Specialty Products; and only dispense the Products into bottles after a consumer has decided to make a purchase," unlike other business models in the olive oil industry in which retailers "still sell products pre-packed in glass bottles or other containers."  *Id.* ¶¶ 17, 18.  In 2006, Veronica Foods began assisting with the opening of stand-alone olive oil stores, and has since assisted with the opening of over 800 stores in the United States and Canada.  *Id.* ¶ 19.  Veronica Foods has provided these stores with "guidance and advice on matters such as location; lease terms; store design, layout, and construction; and product selection," as well as training sessions for owners and employees.  *Id.* ¶ 20.

During the course of its work with its suppliers and customer stores, Veronica Foods contends it has created and compiled three distinct groups of trade secret information, all of which are at issue for this litigation.  First, Veronica Foods states it has created a "Customer List" or "list of the stores to which it sells Specialty Products," which it contends is "unique" because it "reflect[s] all of the work that Veronica Foods put into assisting with the creation of its customer stores," and "represents a compilation of hundreds of stores that have adopted the Veronica Foods business model."  *Id.* ¶¶ 20, 21, 24.

Second, Veronica Foods also contends that what it refers to as its "Confidential Business Information," or "extensive, confidential, information relating to its business and customers," is a trade secret developed "only through years of working with its customer stores and its suppliers," and that Veronica Foods spent "considerable time and resources in gathering and compiling the Confidential Business Information."  *Id.* ¶¶ 25–26.  According to Veronica Foods, this

2

United States District Court
Northern District of California

1   Confidential Business Information includes:

2           (a) the name and contact information for the person(s) at each
3       Veronica Foods customer store responsible for purchasing bulk
        olive oils and balsamic vinegars; (b) the ordering history of each
4       customer store, including records of the types and quantities of
        Specialty Products purchased; (c) other information regarding the
5       particular needs, characteristics, and preferences of each customer;
        (d) billing and payment information for each customer; (e) product
6       information for Specialty Products; and (f) cost and pricing
        information for the Specialty Products, including information on
7       profit margins.

    *Id.* ¶ 25.
8

9           Third, Veronica Food contends its confidential "Supplier List," detailing information

10  regarding its suppliers, qualifies as a trade secret. *Id.* ¶ 30–36. This Supplier List includes:

11          the suppliers and printers of the Specialty Glass Bottles; a complete
        list of the Specialty Products that Veronica Foods sells to its
12      customer stores; the identities of the companies from which
        Veronica Foods obtains those Specialty Products; contact
13      information for the person(s) at each supplier with whom Veronica
        Foods works; and information concerning the prices the suppliers
14      charge to Veronica Foods for the Specialty Products they provide.

15  *Id.* ¶ 30.

16          In forming these lists and compiling this information, Veronica Foods alleges it invested

17  substantial time and effort to create these business relationships, such that these lists would be

18  valuable to business competitors because they uniquely reflect the rewards of Veronica Foods'

19  investment. *See id.* ¶¶ 24, 26–27, 33. Veronica Foods additionally contends this information is

20  private and alleges that it has taken reasonable steps to maintain the secrecy of these trade secrets

21  by imposing password protection of files, preventing remote access, and requiring its employees to

22  sign confidentiality agreements. *Id.* ¶¶ 28–29, 35–36.

23          While Veronica Foods contends that its "trade secrets are not public information," it

24  acknowledges that there were periodic public disclosures of supplier or customer information. *See*

25  *id.* ¶¶ 40–43. For example, Veronica Foods acknowledges that "certain websites, including the

26  'Truth in Olive Oil' website, purport to identify stores selling Veronica Foods olive oil," but

27  alleges that "any purported list of Veronica Foods's customer stores available on line is inaccurate,

28  incomplete, and/or outdated," such that "[t]he full Customer List is not available from any public

3

United States District Court
Northern District of California

source." *Id.* ¶ 41. Veronica Foods further alleges that the "public sources do not reveal any of the extensive, additional confidential information relating to the Customer List," such as "names and contact information for the persons at customer stores responsible for purchasing bulk olive oils and balsamics; stores' ordering histories; other information regarding stores' needs, characteristics, and preferences; or stores' billing and payment information." *Id.* ¶ 42. Similarly, while Veronica Foods acknowledges past public disclosures of supplier information in the form of "announcements relating to Veronica Foods's relationships with individual suppliers" that "may periodically be published on line," it alleges that its "complete Supplier List is not publically [sic] available." *Id.* ¶ 43. Veronica Foods also alleges that no public source has yet revealed further confidential information related to suppliers such as "a complete list of the names and contact information for the persons with whom Veronica Foods works in obtaining Specialty Products; the prices that suppliers charge to Veronica Foods for the Specialty Products; complete information on blends, formulations, recipes, and chemical analysis for the Specialty Products; or Veronica Foods's profit margins with respect to various Specialty Products." *Id.* ¶ 43.

Defendant Ecklin worked for Veronica Foods in a customer service and sales capacity from February 11, 2004 to October 25, 2015. *Id.* ¶¶ 44, 46, 53. Prior to his employment with Veronica Foods, Ecklin was required to sign a confidentiality agreement that explicitly precludes misappropriation of trade secrets, and which, according to Veronica Foods, remains in full force per its original terms. *Id.* ¶ 47. During his time working for Veronica Foods, "Ecklin had regular contact with [its] customers; learned extensive details about them; and acquired detailed knowledge of the information included [sic] the Customer List, the Supplier List and the compilation of Confidential Business Information." *Id.* ¶ 46. Ecklin eventually resigned from his position with Veronica Foods in October 2015, allegedly informing Veronica Foods he had "no direct interest in remaining in the food oils arena." *Id.* ¶ 53. Despite this, Ecklin began working with a direct competitor, Defendant MillPress, in January 2016. *Id.* ¶¶ 53–54.

At the time of MillPress's incorporation, its president and founder Tim Balshi was the proprietor of four retail stores that purchased Specialty Products from Veronica Foods. *Id.* ¶¶ 49–50. MillPress subsequently began supplying Balshi's retail stores as well as persuading other

1    stores to purchase from MillPress instead of Veronica Foods.  *Id.* ¶ 51.

2         Veronica Foods alleges that after Ecklin began work with MillPress, Defendants "have

3    been deliberately soliciting business from stores they know to be customers of Veronica Foods—

4    taking advantage of Ecklin's knowledge of Veronica Foods's Customer List, Confidential

5    Business Information, Supplier List, and the relationships that Ecklin established with [Veronica

6    Foods'] customers while working for Veronica Foods."  *Id.* ¶ 54.  Veronica Foods further alleges

7    that Defendants began using these trade secrets "sometime before August of 2016" and that since

8    late August 2016, "approximately 20 customer stores, which are continuing to sell olive oil and

9    balsamic products to consumers, have terminated their relationships with Veronica Foods," instead

10   purchasing similar products from MillPress.  *Id.* ¶ 56.  According to Veronica Foods, Defendants

11   have also used the Supplier List to attempt to "get [Veronica Foods'] suppliers, including but not

12   necessarily limited to the supplier who prints Specialty Glass Bottles for Veronica Foods, to

13   supply MillPress."  *Id.* ¶ 60. Veronica Foods contends that "Defendants are continuing to

14   improperly use Veronica Food's trade secrets in soliciting [Veronica Foods'] customer stores,"

15   such that "Veronica Foods is continuing to lose customers and to incur damages."  *Id.* ¶ 62.

16           **2.  Claims**

17        As detailed above, Veronica Foods contends that it developed three unique groups of trade

18   secrets that Defendants misappropriated: (1) the Customer List, (2) Confidential Business

19   Information, and (3) the Supplier List.  *See id.* ¶¶ 15–43.  Veronica Foods asserts that Defendants'

20   misappropriation of these trade secrets gives rise to two causes of action—"misappropriation of

21   trade secrets in violation of California Civil Code § 3426 et seq.," (the CUTSA), and

22   "misappropriation of trade secrets in violation of 18 U.S. Code § 1836 et. seq." (the DTSA).  FAC

23   ¶¶ 64–82 (capitalization altered throughout).  As a result of this misappropriation, Veronica Foods

24   claims that it is entitled to damages and injunctive relief to prevent the continued use of trade

25   secrets.  *Id.* ¶ 63.

26        With respect to its CUTSA claim, Veronica Foods alleges that Defendants violated the

27   CUTSA through "their improper use and disclosure of [Veronica Foods'] trade secrets and

28   confidential business information."  *Id.* ¶ 65.  Veronica Foods further alleges that Ecklin obtained

United States District Court
Northern District of California

access to these secrets while working for Veronica Foods, that Ecklin was aware of his duty to maintain the secrecy of these trade secrets obtained in the course of employment with Veronica Foods, and that Defendants have improperly used and disclosed—and continue to use and disclose—Veronica Foods' trade secrets.  *Id.* ¶¶ 67–71.  Veronica Foods contends that it "has suffered, and will continue to suffer, great harm and damage," such that it "is entitled to recover damages for its actual losses; and/or is entitled to recover for the unjust enrichment caused by Defendants' misappropriation of [Veronica Foods'] trade secrets."  *Id.* ¶ 72.  Finally, Veronica Foods contends that because "Defendants' conduct in misappropriating [Veronica Foods'] trade secrets was and continues to be willful and malicious," exemplary damages and an award of attorneys' fees are warranted.  *Id.* ¶ 74.

With respect to the DTSA, Veronica Foods similarly alleges that Defendants' "improper use and disclosure of [Veronica Foods'] trade secrets and confidential information; including, but not necessarily limited to, [Veronica Foods'] Customer List, Confidential Business Information, and Supplier List," give rise to liability.  *Id.* ¶ 76.  Veronica Foods contends that while "Defendants began improperly using Veronica Foods's trade secrets for their own benefit sometime before August of 2016," Defendants also "were using trade secrets misappropriated from Veronica Foods when they convinced Veronica Foods customer stores to switch their business to MillPress in August of 2016, September of 2016, November of 2016, January of 2017, and February of 2017."  *Id.* ¶ 79.  Once more, Veronica Foods contends that its past and ongoing harms warrant damages and injunctive relief, and that Defendants' actions were "willful and malicious," to justify exemplary damages and a recovery of attorneys' fees.  *Id.* ¶¶ 80–82.

**B.    The Parties' Arguments**

**1.    Defendants' Motion to Dismiss and Request for Judicial Notice**

On March 17, 2017, Defendants filed their present motion to dismiss, arguing that the first amended complaint fails to state claims for relief under both the DTSA and the CUTSA, and that Veronica Foods "launched this baseless lawsuit in an attempt to strangle its competitor in the cradle" and "protect its monopoly power."  *See* Mot. at 1, 3.  Defendants contend that Veronica Foods' allegations do not support a claim for misappropriation of trade secrets where, as here, a

6

United States District Court
Northern District of California

1   plaintiff "has publicly disclosed, year after year, for more than a half-decade, the very information

2   it now claims to be 'secret', and where the FAC utterly fails to allege any improper conduct by

3   Defendants." *Id.* at 3.

4        Defendants argue that past disclosures of allegedly secret information destroy any trade

5   secret protection they might have had.  As examples of these public disclosures, Defendants point

6   to "a public list of more than 200 of [Veronica Foods'] customer stores" that Veronica Foods itself

7   maintains online, Veronica Foods' intentional directing of traffic to customer lists via its blogs and

8   Facebook pages, Veronica Foods' periodic disclosure of supplier identities via online

9   announcements, further disclosures regarding supplier and customer identities via Facebook, and

10  Veronica Foods' customers' public disclosures regarding their relationship.  *Id.* at 6–9.

11            a.   Defendants' Request for Judicial Notice

12       In support of their argument that Veronica Foods disclosed purportedly confidential

13  business information, Defendants request judicial notice of thirty-six exhibits, including pages

14  from Veronica Foods' website, Veronica Foods' social media posts, media reports, and pages

15  from retailers' and other third parties' websites, on the basis that the information contained in such

16  materials "'can be accurately and readily determined from sources whose accuracy cannot

17  reasonably be questioned.'"  *See* Defs.' Req. for Judicial Notice ("Defs.' RJN," dkt. 31) ¶ 37

18  (quoting Fed. R. Evid. 201(b)).  The Court takes judicial notice of exhibits showing Veronica

19  Foods' own disclosures through its websites and social media accounts, because the Court can

20  readily determine what Veronica Foods has disclosed by accessing those publicly available online

21  sources.  *Id.* Exs. 1, 2, 7, 10–27, 32; *see, e.g.*, *W. Marine, Inc. v. Watercraft Superstore, Inc.*, No.

22  C11-04459 HRL, 2012 WL 479677, at *10 (N.D. Cal. Feb. 14, 2012) (collecting cases taking

23  judicial notice of a party's own website).  Those materials show that Veronica Foods from time to

24  time disclosed certain of its olive oil and vinegar suppliers, retailers, and testing standards.  *See*

25  Defs.' RJN Exs. 1, 2, 7, 10–27, 32.

26       The Court declines to take judicial notice of a purported Veronica Foods newsletter

27  because it is not clear how the veracity of that exhibit "can be accurately and readily determined"

28  at the pleading stage.  *See id.* Ex. 9; Fed. R. Evid. 201(b).  The Court also declines to take judicial

United States District Court
Northern District of California

notice of media reports and third party websites. *See* Defs.' RJN Exs. 3–6, 28–31, 33–36. Courts may in some circumstances take judicial notice of news reports solely "to 'indicate what was in the public realm at the time, not whether the contents of those articles were in fact true,'" *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2009) (citation omitted), but without any independent basis to determine the truth of the media reports at issue here, they have no value in resolving the present motion. The same principle applies to other third party websites—with the exception of Exhibit 8, a list of Veronica Foods retailers from the third party website truthinoliveoil.com, of which the Court takes notice because Veronica Foods itself referred the public to that site. *See* Defs.' RJN Exhibit 10 (social media post by Veronica Foods linking to the truthinoliveoil.com list and quoting that website's statement that "all of these locations are supplied by Veronica Foods"). Regardless, the materials that the Court declines to consider are largely cumulative to the relevant information provided by Veronica Foods' own internet posts—i.e., that at least some of Veronica Foods' retailers, suppliers, and standards had been publicly disclosed—or have little if any relevance to the present motion. *See, e.g.*, *id.* Exs. 4, 5 (media reports regarding MillPress owner Balshi's business experience).

### b. Arguments Regarding Veronica Foods' DTSA Claim

As discussed in more detail below, Defendants present three distinct arguments as to why Veronica Foods' DTSA claims should be dismissed, asserting that Veronica Foods fails to allege: (1) "any misconduct after the DTSA became effective"; (2) "the existence of a viable trade secret"; or (3) "that Defendants improperly acquired, used, or disclosed the identities of [Veronica Foods'] customers and suppliers." Mot. at 11, 12, 19 (capitalization altered throughout).

First, Defendants claim that Veronica Foods has not alleged any misconduct after the DTSA's effective date of May 11, 2016. *Id.* at 11. Instead, Defendants claim that Veronica Foods "explicitly premises its DTSA claims on alleged conduct that occurred *before* May 11, 2016," specifically the alleged acquisition of trade secrets prior to Ecklin's departure on October 25, 2015 and the alleged solicitation of customers beginning in January 2016. *Id.* at 12. With respect to conduct alleged to have occurred after May 11, 2016, Defendants argue that Veronica Foods' allegations are conclusory and vague, and that "[r]ather than specifying each Defendant's alleged

role in the purported misconduct, [Veronica Foods' complaint] lumps both of them together and conclusorily asserts 'improper[] use.'"  *Id.* (final brackets in original; citation omitted.) Defendants contend Veronica Foods' statement that "'Defendants were using trade secrets . . . in August of 2016, September of 2016, October of 2016, November of 2016, January 2017, and February of 2017'" to be insufficient because that list of dates is "not supported by a single factual allegation as to any specific act by either Ecklin or MillPress occurring in any of these months." *Id.* (quoting FAC ¶ 79).

Second, Defendants argue that Veronica Foods fails to allege the existence of a viable trade secret.  *Id.* at 12–19.  According to Defendants, Veronica Foods "fails to allege that its customers' and suppliers' identities or any other information are trade secrets," or that it "took reasonable measures to protect the purported trade secrets."  Mot. at 13, 17 (capitalization altered throughout).  Defendants contend that Veronica Foods' purported trade secrets are not actually secret because Veronica Foods has not only failed to protect the secrecy of customers' and suppliers' identities but in fact actively published those identities in its online marketing materials. *Id.* at 13–14 (citing, *e.g.*, Defs.' RJN Exs. 8, 10, 12).  Defendants further contend that such disclosures continued to occur after Ecklin started working with MillPress, that the disclosures indicate that Veronica Foods "never treated this information as secret," and to the extent that Veronica Foods did not disclose *all* of its customers and suppliers, the quantity and nature of these disclosures still show that the substance of the customer and supplier lists is not secret in nature. *Id.* at 14–15.

With respect to the Confidential Business Information, Defendants contend that this "new" category of trade secrets is a "hodgepodge of vague allegations," which fails because "none [of the allegations] is tied to any non-conclusory allegations of improper acquisition, use or disclosure." *Id.* at 16.  Defendants argue that: (1) Veronica Foods' allegations regarding "Customers' Names and Contact Information" are deficient due to previous public disclosures; (2) allegations regarding "Customers' Ordering Histories" are deficient because Veronica Foods does not allege this information was unobtainable by proper means and alleges no improper acquisition or use; (3) allegations regarding "Customers' Needs, Characteristics, and Preferences" fail as vague and

United States District Court
Northern District of California

have been disclosed to the public; (4) allegations regarding "Customers' Billing and Payment Information" fail because such a rule would absurdly impose on Veronica Foods' customers a duty to maintain secrecy of their own billing information; (5) allegations regarding "Plaintiff's Product Information" are insufficient because Veronica Foods fails to allege which product information amounts to trade secrets and has disclosed information related to "Chemical Requirements" already; and (5) allegations regarding "Plaintiff's Cost and Pricing Information" fail because such information is dictated by the market and is therefore public. *Id.* at 16–17 (emphasis omitted).

Defendants also contend that Veronica Foods fails to allege the existence of trade secrets because it does not adequately allege it took "reasonable measures" to protect purported trade secrets. *Id.* at 17; *see* 18 U.S.C. § 1839(3)(A). In support of this argument, Defendants contend that public disclosure is "'fatal to the existence of a trade secret.'" Mot. at 17 (quoting *In re Providian Credit Card Cases*, 96 Cal. App. 4th 292, 304 (2002)). According to Defendants, "[b]y publicly disclosing a list of hundreds of its customer stores, as well as announcing the names of its customers and suppliers on its blog and Facebook page, Veronica Foods has essentially shouted their names from the rooftops," which is the opposite of taking reasonable measures to protect the secrecy of this information. *Id.* Defendants further argue that Veronica Foods' efforts to rely on its confidentiality agreement fail because Veronica Foods did not attach to its complaint "a copy of the *specific agreement* that Ecklin allegedly signed" establishing a continuing duty, and that Veronica Foods' allegation that the agreement encompassed disclosure of "'customers, clients, marketing, and current or future business plans'" does not sufficiently allege "that the *mere identities* of [Veronica Foods'] customers are confidential." *Id.* at 18. Defendants contend that by failing to take down the myriad disclosures made online regarding allegedly secret information, Veronica Foods continues to fail to take reasonable measures to protect its alleged secrets. *Id.* at 19.

Third, Defendants contend that Veronica Foods "fails to allege that Defendants improperly acquired, used, or disclosed the identities of its customers and suppliers" as required under DTSA. *Id.* (capitalization altered throughout). According to Defendants, Veronica Foods fails to allege

"any acquisition, disclosure, or use of the purported trade secrets through 'improper means.'" *Id.* (quoting 18 U.S.C. § 1839(5)). Defendants argue that Veronica Foods' awareness of its own and third parties' disclosures related to alleged trade secrets demonstrates its consent to the acquisition and use of that information, and that Defendants were aware of such consent through their experience in the industry. *Id.* at 20. Moreover, Defendants contend that Veronica Foods fails to allege either a breach of the confidentiality agreement at issue or "any improper use or disclosure" with sufficient specificity. *Id.* at 20–21. Instead, Defendants contend that Veronica Foods' "conclusory allegation" that Defendants used Veronica Foods' trade secrets to solicit customers and unfairly compete "falls well short of pleading any improper acts." *Id.* at 21. According to Defendants, Veronica Foods' allegations do not exclude an "innocuous alternative explanation" of a new market competitor attempting to enter a market "dominated by a single player," which Defendants contend is "the essence of *fair* competition," and that Veronica Foods therefore fails to state a plausible claim that Defendants engaged in misconduct. *Id.* at 21–22.

### c.  Arguments Regarding Veronica Foods' CUTSA Claim

Defendants argue that Veronica Foods' CUTSA claim also "suffers from numerous deficiencies and therefore cannot withstand dismissal." *Id.* at 22. First, as with Veronica Foods' DTSA claim, Defendants content that Veronica Foods does not adequately allege the existence of a viable trade secret, in light of not only the disclosures discussed above in relation to the DTSA claim, but also Veronica Foods' failure "to plead facts showing that [the information at issue] falls outside the general knowledge of those in the olive oil and vinegar industry." *Id.* at 22–23. Second, Defendants reiterate their arguments that Veronica Foods consented to the acquisition and use of information due to past disclosures and that Veronica Foods fails to allege improper use by Defendants. *Id.* at 23. Third, Defendants argue that Veronica Foods "fails to show that public policy favors protection of its monopoly power over Ecklin's interest in other employment," as Defendants contend is required under California trade secret law, and further argue that the balance of those interests "unquestionably favors Ecklin's interest in working for his new employer over [Veronica Foods'] interest in protecting its monopoly power." *Id.* at 24 (citing *Diodes, Inc. v. Franzen*, 260 Cal. App. 2d 244, 250 (1968)). According to Defendants, each of

11

those deficiencies provides grounds for dismissal of Veronica Foods' CUTSA claim.

### 2. Veronica Foods' Opposition and Request for Judicial Notice

Veronica Foods argues that Defendants' motion should be denied because "a complaint need only suggest a plausible entitlement to relief," which Veronica Foods contends it has done under both the CUTSA and DTSA. Opp'n[2] at 8–9, 22 (capitalization altered throughout). According to Veronica Foods, because "[t]he facts alleged in the FAC establish that the information at issue is valuable, not generally known or available, and the subject of reasonable efforts to maintain its confidentiality," these facts adequately allege "the existence of trade secrets under the California and federal statutes." *Id.* at 2. Veronica Foods contends the allegations regarding misappropriation and damages are also sufficient as its complaint "also alleges that Defendants have misappropriated Veronica Foods's trade secrets by using them to solicit Veronica Foods's customers; and that Defendants' actions have resulted in Veronica Foods losing customers and sales – thereby incurring damages." *Id.* Veronica Foods therefore contends that its complaint satisfies Rule 8(a) by setting forth a "'short and plain statement'" of plausible claims, and that there is no basis for dismissal. *Id.* (quoting Fed. R. Civ. P. 8(a)).

Veronica Foods contends its CUTSA claim is sufficient because it satisfies the requirements that "a complaint need only allege facts plausibly suggesting that [sic] '(1) that the plaintiff owned a trade secret; (2) that the defendant acquired, disclosed, or used that trade secret through improper means; and (3) that the defendant's actions harmed the plaintiff.'" *Id.* at 10 (quoting *E.D.C. Techs., Inc. v. Siedel*, No. 16-CV-03316-SI, 2016 WL 4549132 at *7 (N.D. Cal. 2016)).

First, Veronica Foods asserts that its "Customer Information,"[3] or the "customer list and

---

[2] Veronica Foods initially filed its opposition on April 14, 2017, but filed a corrected version of the opposition on April 18, 2017. *See* Original Opp'n (dkt. 35); Corrected Opp'n (dkt. 36). For ease of reference, this order refers to the corrected opposition as simply the "opposition," or in citations, "Opp'n."

[3] Veronica Foods' first amended complaint does not include the term "Customer Information," instead referring to the "Customer List" and "Confidential Business Information" as distinct trade secrets. *See* FAC ¶¶ 20, 25. In its opposition, Veronica Foods defines "Customer Information" as encompassing its "customer list; its contacts at the customer stores; customers' ordering histories; information regarding customer needs, characteristics, and preferences; billing records; and information on cost, prices, and profit margins." Opp'n at 10 (referencing FAC ¶ 25).

United States District Court
Northern District of California

customer-related information at issue in this litigation" is a trade secret qualifying for protection under the CUTSA.  *Id.* at 4, 10 (quoting *Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1077 (N.D. Cal. 2016), for the proposition that "Customer Information, including 'information such as sales history and customer needs and preferences constitute trade secrets'").  Veronica Foods contends that "[a]lthough some California courts may be 'reluctant to protect customer lists to the extent they embody information which is "readily ascertainable" through public sources, such as business directories,' the courts take a different view 'where the employer has expended time and effort identifying customers with particular needs or characteristics,'" as Veronica Foods argues is the case with its Customer Information.  *Id.* at 11 (quoting *Wanke, Indus., Commercial, Residential, Inc. v. Superior Court*, 209 Cal. App. 4th 1151, 1174–75 (2012)).  Veronica Foods claims that the customer information at issue "must be 'distinguished from mere identities and locations of customers where anyone could easily identify the entities as potential customers.'"  *Id.* (quoting *Wanke*, 209 Cal. App. 4th at 1175).  Within this framework, Veronica Foods contends that because it "seeks protection for Customer Information that encompasses more than customer names and includes 'specific details on customers' purchasing histories that [are] not readily ascertainable by competitors,'" this information qualifies as a trade secret.  *Id.* at 12 (quoting *Extreme Reach v. Spotgenie Partners, LLC*, 2013 WL 12081182 (C.D. Cal. Nov. 22, 2013)) (alteration in original).

Veronica Foods further delineates "Customer Information" into three distinct subgroups of alleged trade secrets: (1) "'[t]he name and contact information for the person(s) at each Veronica Foods customer store responsible for purchasing bulk olive oils and balsamic vinegars'"; (2) a category including "'[t]he ordering history of each customer store[,]' 'billing and payment information for each customer[,]' and 'cost and pricing information for the Specialty Products, including information on profit margins'"; and (3) "'[i]nformation regarding the particular needs, characteristics, and preferences of each customer.'"  *Id.* at 12–15 (quoting FAC ¶ 25, which defines "Confidential Business Information").  First, with respect to "name and contact information" for customer store representatives, Veronica Foods contends that even the routine disclosure of some customer contact information would not minimize the trade secret value of the

United States District Court
Northern District of California

1   "'key contacts within [each] customer's business.'"  *Id.* at 12 (quoting *Courtesy Temp. Serv., Inc.*

2   *v. Camacho*, 222 Cal. App. 3d 1278, 1287(1990)) (alteration in original).  Veronica Foods

3   emphasizes that "there is a difference between knowing the name and location of a potential

4   customer and knowing the person making the purchasing decisions for the potential customers,"

5   stating that relevant case law has found a former employee's use of personal customer contacts

6   and relationships, and the influence that arises from that those relationships, to be unfair to a

7   former employer.  *Id.* at 12 (citing *Morlife, Inc. v. Perry*, 56 Cal. App. 4th 1514, 1517 (1997)).

8   Second, with respect to ordering history, billing and payment information, and pricing

9   information, Veronica Foods contends these pieces of information all qualify as trade secrets

10  under relevant law, and that Defendants' assertion that this information cannot be secret is a

11  misstatement of the law.  *Id.* at 13.  Veronica Foods also disputes Defendants' arguments that the

12  possibility of third party disclosure by customers defeats Veronica Foods' claims, stating that

13  "Defendants cite no case supporting the suggestions that pricing data, ordering histories or any of

14  Veronica Foods's other Customer Information should be deemed to be non-secret merely because

15  a hypothetical competitor hypothetically cold calling some 800 customer stores might have been

16  able to convince some of them to divulge some of that information."  *Id.* at 14.  Third, with respect

17  to information regarding customers' needs, characteristics, and preferences, Veronica Foods

18  asserts that "Federal and California Courts applying the UTSA have repeatedly held that

19  'customer needs and preferences constitute trade secrets.'"  *Id.* at 14–15 (quoting *Henry Schein*,

20  191 F. Supp. 3d at 1077).  Veronica Foods therefore contends that "there is nothing 'vague' or

21  improper in FAC ¶ 25(c)'s use of these terms to describe trade secrets at issue."  *See id.*

22      Similarly, Veronica Foods contends that its allegations regarding its "Supplier/Product

23  Information,"[4] defined as "Veronica Foods's list of suppliers; contact information for supplier

24  representatives; the complete list of the Specialty Products; pricing data; and product data,"

25

26  ───────────────

27  [4] As with "Customer Information," Veronica Foods defines this category of trade secrets for the
    first time in its opposition, combining the information described in the first amended complaint as
    Veronica Foods' "Supplier List," FAC ¶ 30, as well as "product information for specialty
28  products," previously included within the category of "Confidential Business Information," *id.*
    ¶ 25(e).

14

adequately allege the existence of a trade secret.  *Id.* at 15.  According to Veronica Foods, "[i]t is undisputed that 'the identity of a supplier can be a trade secret.'"  *Id.* (quoting *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1108 (9th Cir. 2001)).  Veronica Foods further asserts that "[p]ricing and contact information also squarely fall within the UTSA's definition of trade secrets," and that while Defendants dispute which information has been previously disclosed from this category, they "do not seriously dispute the adequacy of the FAC's description of the Supplier/Product Information."  *Id.* at 15–16.

With respect to both the Customer Information and Supplier/Product Information, Veronica Foods claims it "has taken reasonable steps to preserve its secrets" as required by the statutes at issue through its requirement that employees sign a confidentiality agreement and its use of password protection for computers at its headquarters.  *Id.* at 16.  According to Veronica Foods, courts have held that password protecting confidential information and requiring employees to sign a confidentiality agreement concerning trade secrets both amount to "reasonable steps" to maintain secrecy.  *Id.*  Veronica Foods disputes the contention that it "should have filed suit sooner, imposed secrecy agreements on its customers, or taken other steps to preserve the confidentiality of trade secrets," arguing that those possible further protections "cannot render the steps that Veronica Foods did take unreasonable or inadequate."  *Id.* at 17 (quoting *PQ Labs, Inc. v. Yang Qi*, No. 12-0459 CW, 2014 WL 4954161, at *6 (N.D. Cal. 2014), for the proposition that "Plaintiffs need not employ every conceivable method of protecting their trade secrets in order to show that they made 'reasonable' efforts to do so").  Veronica Foods also argues that "the Confidentiality Agreement is more than broad enough to cover all of the confidential, trade secret information at issue" because it recites such broad categories as "customers," "clients," and "trade secrets," and Veronica Foods contends that Ecklin "remains bound by it; no provision of the Agreement relieves an employee of duty to maintain confidentiality of Veronica Foods's information when his employment with Veronica Foods ends."  *Id.*

Veronica Foods requests that the Court take judicial notice of an unsigned copy of its form confidentiality agreement based on the doctrine of incorporation by reference.  Pl.'s Req. for Judicial Notice ("Pl.'s RJN," dkt. 35-1).  The Court takes such notice and, for the limited purpose

of the current motion, deems the first amended complaint to allege that Ecklin signed an agreement identical to the unsigned copy presented by Veronica Foods.  If Veronica Foods files a second amended complaint relying on the confidentiality agreement, however, it is instructed to attach a copy and to specifically allege that it is the same agreement that Ecklin signed.

Veronica Foods asserts that "Defendants' arguments regarding the alleged disclosure or availability of certain information do not support the motion to dismiss."  Opp'n at 17 (capitalization altered throughout).  Veronica Foods claims that the public disclosures of its retailers identify "about 200 stores – only 25% of Veronica Foods's customers."  *Id.* at 18.  Veronica Foods emphasizes that neither its complete customer list nor its complete supplier list are available from public sources.  *Id.* (citing FAC ¶¶ 41, 43).  Veronica Foods also asserts that its allegations "establish[] that there is no public source for the rest of the Customer and Supplier/Product Information – including contact information for the key individuals at Veronica Foods's customers and suppliers; customers' ordering histories and preferences; and information on costs and profit margins."  *Id.* (citing FAC ¶¶ 42–43).  Additionally, Veronica Foods claims that "Defendants cannot prevail by arguing that some segment of the Customer Information or the Supplier/Product Information was 'generally known' or 'publically [sic] available'" because that is a "'relative'" and "'fact-intensive'" analysis not properly determined at the pleadings stage.  *Id.* at 19 (quoting *Spring Design, Inc. v. Barnesandnoble.com, LLC*, No. C 09-05185 JW, 2010 WL 5422556, at *4 (N.D. Cal. Dec. 27, 2010)).  Similarly, Veronica Foods contends that "[u]nder California law, 'ease of ascertainability' must be raised as an affirmative defense," and generally is properly determined by a finder of fact rather than at the pleadings stage.  Opp'n at 20 (quoting *ABBA Rubber Co. v. Seaquist*, 235 Cal. App. 3d 1, 21 n.9 (1991)).

Next, Veronica Foods contends that its allegations that Defendants misappropriated its trade secrets are sufficient to withstand a motion to dismiss.  *Id.* at 20–21.  Veronica Foods argues that its allegations "are fully in accord with cases like *MAI Systems* and *Morlife*," which hold that "'[m]isappropriation occurs if information from a customer database is used to solicit customers.'"

16

*Id.* at 20 (quoting *MAI Systems*, 991 F.2d 511, 521 (9th Cir. 1993),[5] and citing *Morlife*, 56 Cal. App. 4th at 1523–26).  Specifically, Veronica Foods contends it has sufficiently alleged that:

> in "soliciting business from stores they know to be customers of Veronica Foods" Ecklin and MillPress have been "taking advantage of Ecklin's knowledge of Veronica Foods's Customer List, Confidential Business Information, Supplier List, and the relationships that Ecklin established with [Veronica Foods'] customers while working for Veronica Foods."

*Id.* at 20–21 (quoting FAC ¶ 54).  Veronica Foods contends these allegations are analogous to those at issue in a District of Hawaii case where the court held that a plaintiff "had 'more than sufficiently' demonstrated misappropriation by alleging that defendant 'solicited business from [plaintiff's] clients, used [plaintiff's] proprietary information to solicit proposed funding, interfered with its contracts, [and] breached its nondisclosure with [plaintiff].'"  *Id.* at 20 (quoting *BlueEarth Biofuels, LLC v. Hawaiian Elec. Co.*, 780 F. Supp. 2d 1061, 1079 (D. Haw. 2011)) (alterations in original).

Veronica Foods argues that its allegations meet the test for a CUTSA claim because a "former employer may state a claim against both the new business and the former employee by alleging (1) ownership of a trade secret; (2) misappropriation by the defendants; and (3) damage."  Opp'n at 21 (citing *E.D.C. Techs.*, 2016 WL 4549132, at *7).  According to Veronica Foods, it "is under no obligation to plead or prove a 'public policy . . . [that] outweighs' Ecklin's interest in using trade secrets that do not belong to him," because the "*Diodes* case on which Defendants rely was decided [based on common law] before California adopted the UTSA in 1984" and is therefore inapplicable to the statutory claims at issue here.  *Id.* at 21, 22 (quoting Mot. at 24, and citing *Diodes*, 260 Cal. App. 2d 244) (alterations in original).  Veronica Foods goes on to argue that, even if there were a requirement to balance harms, "the FAC alleges facts establishing both that it would be unfair to allow Ecklin to exploit Veronica Foods's trade secrets (FAC ¶63); and that Ecklin has ample other opportunities to support himself."  *Id.* at 22.

---

[5] The opposition brief changed the capitalization of this sentence and omitted emphasis without notation.  This order therefore uses brackets to show a change from the text of the opposition, even though the result is the same capitalization as in the original.  This order follows the opposition in omitting emphasis used by the Ninth Circuit in the original.

Veronica Foods contends that most of "Defendants' attacks on [the DTSA] claim fail for the same reasons that their attacks on the California UTSA claim fail" because "[t]he same factual allegations support both claims," and that Defendants' arguments specific to the DTSA are "baseless." *Id.* With respect to Defendants' argument that Veronica Foods alleged no misconduct after the DTSA's effective date, Veronica Foods argues that its allegations regarding Balshi's and Ecklin's use of trade secrets to solicit of Veronica Foods' customers during several months after the enactment of the DTSA satisfy its burden at the pleading stage. *Id.* at 23. Veronica Foods also contends that Defendants' arguments based on the DTSA's definition of a "trade secret" fail because: (1) "the FAC alleges facts establishing that Veronica Foods's trade secrets are not readily ascertainable to its competitors"; (2) "whether 'ascertainability' questions are addressed by a plaintiff in its case-in-chief, or raised by a defendant as an affirmative defense – these questions are fact-intensive and cannot be resolved on a motion to dismiss"; and (3) "at the pleadings stage, even a bare-bones allegation is sufficient to establish the existence of a trade secret under the DTSA's definition of that term." *Id.* at 24.

### 3.  Defendants' Reply

Defendants' reply emphasizes three main points.  First, Defendants argue that because Veronica Foods' claims are based on the alleged acquisition of trade secrets before October 2015, and because Veronica Foods merely alleges "continuing use" of trade secrets without alleging more particular misconduct after the May 11, 2016 enactment date of the DTSA, Veronica Foods fails to allege actionable conduct under the DTSA.  Reply (dkt. 37) at 3–4.  Defendants note that this Court has previously held that "a DTSA claim cannot be 'based on the continued use of information that was disclosed prior to the effective date of the statute.'" *Id.* at 3 (quoting *Avago Techs. U.S. Inc. v. Nanoprecision Prods., Inc.*, No. 16-cv-03737-JCS, 2017 WL 412524 at *9 (N.D. Cal. Jan. 31, 3017).  According to Defendants, Veronica Foods' failure to identify disclosure of trade secrets or other discrete acts of misconduct that occurred after the effective date, as opposed to merely continuing use of purported trade secrets previously disclosed, constitutes as a tacit concession that no such misconduct occurred.  *Id.*

Second, Defendants reiterate their argument that Veronica Foods' "public disclosures

preclude its trade secret claims." *Id.* at 4.  According to Defendants, by "providing such quick and easy online access to its customers' and suppliers' identities, [Veronica Foods] has made clear that it not only does not consider such information to be 'secret', but that it affirmatively consents to its use by competitors." *Id.* at 5.  Defendants argue that, having disclosed the identities of certain customers and suppliers and having failed to object to similar disclosure by third parties, Veronica Foods "cannot plausibly allege that *any* of its customers' and suppliers' identities are secret." *Id.* at 6.  Defendants point to certain social media posts by Veronica Foods, including statements that it had "'posted a list of California retailers'" and would be releasing the names of certain "'partner mills,'" as demonstrating deliberate disclosure of retailers and suppliers and thus consent to others' use of that information.  *Id.* at 11 (quoting Defs.' RJN Exs. 1, 2).  Defendants further contend that Veronica Foods' past disclosures "render implausible its allegations of reasonable measures to protect the purportedly secret information."  *Id.* at 9 (capitalization altered throughout).

Defendants continue to argue that Veronica Foods' assertions regarding the broad categories of information defined in its opposition are vague, conclusory, and unsubstantiated by specific factual allegations regarding the existence and misappropriation of trade secrets, *id.* at 6–9, and that Veronica Foods "fails to plead facts establishing any misconduct" or excluding an "innocuous alternative explanation," *id.* at 11–12.  Defendants also argue that Veronica Foods' submission of the form confidentiality agreement for judicial notice should not affect the Court's analysis, as "this unsigned four-paragraph agreement does not purport to apply to former employees, such as Ecklin," and its "language is so broad that it cannot plausibly provide notice to [Veronica Foods'] employees as to what, if any, specific information it considers to be secret." *Id.* at 10.

Third, Defendants once more allege that Veronica Foods "fails to plead a public policy favoring protection of its monopoly power." *Id.* at 13 (capitalization altered throughout). Defendants contend that Veronica Foods does not dispute that it holds monopoly power or even that it has abused such power, and "pleads no facts establishing that protecting its monopoly power would outweigh Ecklin's interest in supporting himself through new employment." *Id.*

1   Defendants argue that Veronica Foods' lawsuit is an attempt to exert monopoly power at the

2   expense of fair competition and California's policy disfavoring non-competition agreements.  *Id.*

3   Contrary to Veronica Foods' argument that *Diodes* is inapplicable to statutory claims under the

4   CUTSA, Defendants assert that federal courts have continued to apply the standard articulated in

5   that decision to such claims.  *Id.* at 13 n.9.

6   **III.    ANALYSIS**

7       **A.    Legal Standard for Motions to Dismiss**

8        A complaint may be dismissed for failure to state a claim on which relief can be granted

9   under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  "The purpose of a motion to dismiss

10  under Rule 12(b)(6) is to test the legal sufficiency of the complaint." *N. Star Int'l v. Ariz. Corp.*

11  *Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).  Generally, a claimant's burden at the pleading stage

12  is relatively light.  Rule 8(a) of the Federal Rules of Civil Procedure states that "[a] pleading

13  which sets forth a claim for relief . . . shall contain . . . a short and plain statement of the claim

14  showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a).

15       In ruling on a motion to dismiss under Rule 12(b)(6), the court analyzes the pleading and

16  takes "all allegations of material fact as true and construe[s] them in the light most favorable to the

17  non-moving party." *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).

18  Dismissal may be based on a lack of a cognizable legal theory or on the absence of facts that

19  would support a valid theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir.

20  1990).  A pleading must "contain either direct or inferential allegations respecting all the material

21  elements necessary to sustain recovery under some viable legal theory." *Bell Atl. Corp. v.*

22  *Twombly*, 550 U.S. 544, 562 (2007) (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101,

23  1106 (7th Cir. 1984)).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation

24  of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

25  (quoting *Twombly*, 550 U.S. at 555).  "[C]ourts 'are not bound to accept as true a legal conclusion

26  couched as a factual allegation.'" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S.

27  265, 286 (1986)).  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of

28  'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557)

United States District Court
Northern District of California

20

1    (alteration in original).  Rather, the claim must be "'plausible on its face,'" meaning that the

2    claimant must plead sufficient factual allegations to "allow[] the court to draw the reasonable

3    inference that the defendant is liable for the misconduct alleged."  *Id.* (quoting *Twombly*, 550 U.S.

4    at 570).

5           "If there are two alternative explanations, one advanced by defendant and the other

6    advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to

7    dismiss under Rule 12(b)(6)."  *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).  If, however,

8    "only one of [the alternative explanations] can be true and only one of [them] results in liability,

9    plaintiffs cannot offer allegations that are 'merely consistent with' their favored explanation but

10   are also consistent with the alternative explanation."  *In re Century Aluminum Co. Sec. Litig.*, 729

11   F.3d 1104, 1108 (9th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678).  Addressing the distinction

12   between *Starr* and *In re Century*, the Ninth Circuit explained that in *Starr*, "the plaintiff's

13   plausible complaint survived a motion to dismiss by offering facts that tended to exclude the

14   defendant's innocuous alternative explanation," whereas in *In re Century*, the complaint did not

15   offer facts tending to exclude the innocuous alternative explanation, and therefore "established

16   only a 'possible' entitlement to relief, and thus could not support further proceedings."  *Eclectic*

17   *Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014) (quoting *In re*

18   *Century*, 729 F.3d at 1108).

19          **B.    Legal Standard for Trade Secrets Claims**

20          Under the DTSA, the "owner of a trade secret that is misappropriated may bring a civil

21   action . . . if the trade secret is related to a product or service use in, or intended for use in,

22   interstate or foreign commerce."  18 U.S.C. § 1836(b)(1).  The CUTSA similarly creates a cause

23   of action for the misappropriation of trade secrets, and offers injunctive relief for "actual or

24   threatened misappropriation," Cal. Civ. Code § 3426.2, monetary damages for actual loss and

25   unjust enrichment, Cal. Civ. Code § 3426.3(b), and exemplary damages "[i]f willful and malicious

26   misappropriation exists." Cal. Civ. Code § 3426(c).

27          The DTSA defines the term "trade secret" to mean:

28

*United States District Court*
*Northern District of California*

21

. . . all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—

(A) the owner thereof has taken reasonable measures to keep such information secret; and

(B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3).

"Misappropriation" giving rise to liability under the DTSA is defined as:

(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means[6]; or

(B) disclosure or use of a trade secret of another without express or implied consent by a person who—

(i) used improper means to acquire knowledge of the trade secret;

(ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—

(I) derived from or through a person who had used improper means to acquire the trade secret;

(II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or

(III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or

(iii) before a material change of the position of the person, knew or had reason to know that—

(I) the trade secret was a trade secret; and

---

[6] The DTSA defines "improper means" to include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means," but specifies that the term "does not include reverse engineering, independent derivation, or any other lawful means of acquisition."  18 U.S.C. § 1839(6).

(II) knowledge of the trade secret had been acquired
by accident or mistake.

18 U.S.C. § 1839(5).  The CUTSA's definitions of "trade secret,"[7] "misappropriation," and

"improper use" are substantially identical to the definitions of those terms in the DTSA.  Cal. Civ.

Code § 3426.1(a), (b), (d); *see Waymo LLC v. Uber Techs., Inc*, No. C 17-00939 WHA, 2017 WL

2123560, at *7 (N.D. Cal. May 15, 2017) (stating that "the California Uniform Trade Secrets Act

and the federal Defend Trade Secrets Act . . . offer essentially the same definitions for our

purposes").

Due to the overlap between the statutes, several courts have addressed DTSA claims in

conjunction with claims under the CUTSA and other states' versions of the Uniform Trade Secrets

Act.  For example, in considering whether or not to enjoin continued use of trade secrets, courts

have analyzed likelihood of success on the merits with respect to the DTSA and CUTSA

simultaneously, *see, e.g.*, *Henry Schein*, 191 F. Supp. 3d at 1077; *Waymo*, 2017 WL 2123560, at

*7–10, and another district court considered likelihood of success on DTSA and Nevada UTSA

claims together because "[b]oth statutes create causes of action for the misappropriation of trade

secrets when the owner of the information took reasonable measures to secure that information,"

*Protection Techs., Inc. v. Ribler*, No. 3:17-cv-00144-LRH-WGC, 2017 WL 923912 at *2 (D. Nev.

Mar. 8, 2017); *see also Allstate Ins. Co. v. Rote*, No. 3:16-cv-01432-HZ, 2016 WL 4191015, at *3

(D. Or. Aug. 7, 2016) (considering a DTSA claim in conjunction with a claim under the Oregon

Uniform Trade Secrets Act).

One potentially relevant distinction between the CUTSA and the DTSA in this case is that

the DTSA applies only to "any misappropriation of a trade secret . . . for which any act occurs on

or after [May 11, 2016,] the date of the enactment of [the] Act."  Defend Trade Secrets Act of

2016, Pub. L. No. 114-153, 130 Stat. 376, 381–82 (May 11, 2016).  That being said, Courts have

generally "held that the DTSA applies to misappropriations that began prior to the DTSA's

enactment if the misappropriation continues to occur after the enactment date," so long as the

---

[7] The CUTSA definition of "trade secret" sets forth a shorter list of types of protected information
than the DTSA, but no party suggests that there is any meaningful distinction between the two
statutes' definitions for the purposes of this case.  *Compare* 18 U.S.C. § 1839(3) *with* Cal. Civ.
Code § 3426.1(d).

United States District Court
Northern District of California

United States District Court
Northern District of California

defendant took some relevant act after that date. *Brand Energy & Infrastructure Servs., Inc. v. Irex Contracting Grp.*, No. CV 16-2499, 2017 WL 1105648, at *4 (E.D. Pa. Mar. 24, 2017) (collecting district court decisions nationwide). "Nothing suggests that the DTSA forecloses a use-based theory simply because the trade secret being used was misappropriated before the DTSA's enactment." *Cave Consulting Grp., Inc. v. Truven Health Analytics, Inc.*, No. 15-cv-02177-SI, 2017 WL 1436044 at *4 (N.D. Cal. Apr. 24, 2017). In *Cave Consulting*, Judge Illston dismissed a DTSA claim where the plaintiff alleged that the defendant acquired, used, and shared the trade secrets at issue in 2014 and 2015 without any "specific allegations that defendant used the alleged trade secrets after the DTSA's May 11, 2016 enactment," but she granted leave to amend if the plaintiff could allege improper use after that date. *Id.* at *5. This Court, however, has previously held that where a purported trade secret was *publicly* disclosed before the effective date of the DTSA, a plaintiff cannot rely on a theory "that the same information was disclosed 'again'" after the effective date, because "'disclosure,' by definition, implies that the information was previously secret." *Avago Techs.*, 2017 WL 412524, at *8–9 (dismissing a DTSA claim and quoting *Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1355 (Fed. Cir. 2009), for the proposition that "[o]nce the information is in the public domain and the element of secrecy is gone, the trade secret is extinguished").[8]

### C. Veronica Foods Does Not Plausibly Allege Misappropriation of Trade Secrets

Veronica Foods' claims in this case rest primarily on the theory that Defendants improperly used trade secrets that Ecklin acquired during his employment with Veronica Foods to solicit business from retail stores that previously ordered olive oil and vinegar from Veronica Foods. *See* FAC ¶¶ 58–59. In the context of "customer databases" alleged to be trade secrets, although a former employee may permissibly inform customers of his or her former employer that he or she has taken a position with a competitor, the Ninth Circuit has held that "misappropriation

---

[8] If, as Defendants contend, the CUTSA requires a balancing of interests as applied to California common law trade secrets claims in *Diodes*, 260 Cal. App. 2d at 250, that might be another relevant distinction between the DTSA and CUTSA claims in this case. Because the Court holds that Veronica Foods has not sufficiently alleged misappropriation of trade secrets, this order does not reach that issue.

occurs if information from a [trade secret] customer database is used to *solicit* customers." *MAI Sys.*, 991 F.2d at 521–22 (affirming summary judgment in favor of a plaintiff on a claim under the CUTSA). Such misappropriation does not require a showing that a former employee "physically took any portion of [a former employer's] customer database." *Id.* at 521.

Here, Veronica Foods' allegations of the particular trade secrets that Defendants misused are largely conclusory—an everything-but-the-kitchen-sink assertion that Defendants "have made improper and unauthorized use of Veronica Foods's Customer List, Supplier List, and Confidential Business Information" to solicit customers. *See* FAC ¶ 58. Such "naked assertions" and "conclusions" are not the sort of factual allegations that the Court must accept as true at the pleading stage. *See Iqbal*, 556 U.S. at 678. Two more specific categories warrant further discussion. First, Veronica Foods' allegation that Defendants used Ecklin's specialized knowledge of retailers' personnel, ordering histories, and preferences presents a closer call. *See* FAC ¶ 58. Absent some basis to conclude that Ecklin had such knowledge of the particular stores that Defendants solicited, however—such as allegations that Ecklin had worked with those particular stores while at Veronica Foods—the factual allegations of the first amended complaint do not plausibly support the conclusion that Defendants used Ecklin's trade secret knowledge of retailers' personnel and preferences to solicit Veronica Foods' customers. Second, the mere fact that those retailers were Veronica Foods' customers might itself be a trade secret, *see, e.g.*, *Morlife*, 56 Cal. App. 4th at 1521 (recognizing that lists of customers "with particular needs or characteristics" can be trade secrets), but Veronica Foods does not sufficiently allege that. Instead, while Veronica Foods alleges that it takes steps to protect its customer list and the "full Customer List is not available from any public source," the material Defendants have submitted for judicial notice demonstrates that Veronica Foods itself has publicized its relationship with many of its customers. *See* FAC ¶ 41; Defs.' RJN Exs. 8, 10, 22, 23; *see also Ultimax*, 587 F.3d at 1355 ("Once the information is in the public domain and the element of secrecy is gone, the trade secret is extinguished . . . ."). In light of that disclosure, Veronica Foods' allegations that the "full" list of customers is kept secret means only that *some* of its customer relationships are secret, and there is no specific allegation to support the conclusion that Veronica Foods' relationships

with the particular stores poached by MillPress—including "My Olive, Barrie Olive Oil, and Nutmeg Olive Oil," *see* FAC ¶ 56—were trade secrets.

Veronica Foods' position as the dominant supplier of stand-alone stores that dispense olive oil and vinegar into containers at the time of sale, *see* FAC ¶ 18 (describing Veronica Foods' business model of supplying such stores as "unique"), increases the need for specific allegations showing that Defendants used trade secret knowledge of the identities of Veronica Foods' customers.  Absent allegations supporting that conclusion, the mere fact that MillPress began selling oil and vinegar to stores previously supplied by Veronica Foods is to be expected from a new wholesaler entering the market.  Veronica Foods must allege facts that are not "merely consistent with" both a theory of innocent market entry and the theory that Defendants used Veronica Foods' confidential customer list, but rather "tend[] to exclude" an innocent explanation. *See Eclectic Props.*, 751 F.3d at 997; *In re Century*, 729 F.3d at 1108.

With respect to conduct after the effective date of the DTSA, the assertion that "Defendants were using trade secrets misappropriated from Veronica Foods when they convinced Veronica Foods customer stores to switch their business to MillPress in [certain months after that date]," FAC ¶ 79, is a "'legal conclusion couched as a factual allegation'" that does not meet Veronica Foods' burden of pleading.  *See Twombly*, 550 U.S. at 555 (quoting *Papasan*, 478 U.S. at 286).  To state a claim under the DTSA, Veronica Foods not only must provide more specific allegations of the particular trade secrets Defendants allegedly used to solicit particular retailers as discussed above, but also must more specifically connect such allegations to Defendants' actions after May 11, 2016.[9]

The first amended complaint also briefly alleges that Defendant "have been deliberately taking advantage of Ecklin's knowledge of Veronica Foods's Supplier List; and have been

---

[9] Although the date of Defendants' alleged misappropriation is not necessarily relevant to Veronica Foods' claim under the CUTSA, failure to state a claim under the DTSA would negate this Court's jurisdiction over the case under 28 U.S.C. § 1331.  It is possible that the case might separately fall within the Court's diversity jurisdiction under 28 U.S.C. § 1332, but the current allegations and record do not address the citizenship of the owners or members of MillPress, which, as a limited liability company, "is a citizen of every state of which its owners/members are citizens."  *See Johnson v. Columbia Props. Anchorage, LP*, 437 F.3d 894, 899 (9th Cir. 2006).

United States District Court
Northern District of California

1  attempting to get [Veronica Foods'] suppliers, including but not necessarily limited to the supplier

2  who prints Specialty Glass Bottles for Veronica Foods, to also supply MillPress."  FAC ¶ 60.  As

3  with the identities of Veronica Foods' customers, the allegation that "Veronica Foods's *complete*

4  Supplier List is not publically available," *id.* ¶ 43 (emphasis added), in itself carries little weight

5  where material subject to judicial notice shows that Veronica Foods publicly disclosed at least

6  some of its suppliers.  *See* Defs.' RJN Exs. 1, 12–21, 24–27; *see also Ultimax*, 587 F.3d at 1355.

7  Veronica Foods provides no specific allegations regarding nondisclosure of, or efforts to keep

8  secret, the identity of its glass bottle supplier—the only specific supplier that Defendants allegedly

9  approached.  *See* FAC ¶ 60.  Absent such allegations, or allegations that Defendants misused

10  proprietary, non-public knowledge of other particular suppliers, Veronica Foods' allegations do

11  not plausibly support the conclusion that Defendants misappropriated trade secrets regarding its

12  suppliers.

13  **IV.    CONCLUSION**

14       Because Veronica Foods fails to include sufficient factual allegations plausibly supporting

15  Defendants' misappropriation of trade secrets under either the DTSA or CUTSA, the Court

16  GRANTS Defendants' motion to dismiss the first amended complaint, with leave to amend.  In the

17  absence of more specific allegations regarding the particular purported secrets that Defendants

18  allegedly misused, the Court does not reach Defendants' remaining arguments that certain

19  categories of information at issue do not constitute trade secrets.  Veronica Foods may file a

20  second amended complaint no later than July 31, 2017.

21       **IT IS SO ORDERED.**

22  Dated: June 29, 2017

23  _____

24  JOSEPH C. SPERO
    Chief Magistrate Judge

25

26

27

28

27